# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JEANETTE STEPHENS, | ) | |
| | ) | |
| Claimant, | ) | No. 14-cv-3117 |
| | ) | |
| v. | ) | Jeffrey T. Gilbert |
| | ) | Magistrate Judge |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Jeanette Stephens ("Claimant") seeks review of the final decision of

Respondent Carolyn W. Colvin, Acting Commissioner of Social Security (the "Commissioner"),

denying Claimant's application for Disability Insurance Benefits ("DIB") under Title II of the

Social Security Act (the "Act"). Pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, the parties

have consented to the jurisdiction of a United States Magistrate Judge for all proceedings,

including entry of final judgment. [ECF No. 10.] Claimant has moved pursuant to Federal Rule

of Civil Procedure 56 for summary judgment. [ECF No. 19.] The Commissioner has done

likewise. [ECF No. 23.] For the reasons stated below, Claimant's motion for summary

judgment is denied, and the Commissioner's motion for summary judgment is granted. The

decision of the Commissioner is affirmed.

### I. PROCEDURAL HISTORY

On September 8, 2010, Claimant filed an application for DIB, alleging a disability onset

date of August 19, 2008. (R. 100.) The claim was denied initially on July 12, 2011, and upon

reconsideration on December 2, 2011. (R. 99, 100.) On January 13, 2012, Claimant requested a

hearing before an Administrative Law Judge (the "ALJ"). (R. 136.) The requested hearing was

then held on October 16, 2012. (R. 36-97.) At that hearing, Claimant, who was represented by

counsel, appeared and testified. *Id.* A vocational expert (the "VE") also appeared and testified.

*Id.*

On November 20, 2012, the ALJ issued a written decision. (R. 15-30.) In the decision,

the ALJ went through the five-step sequential evaluation process and ultimately found Claimant

not disabled under the Act. (R. 21.) At step one, the ALJ found Claimant had engaged in

substantial gainful activity ("SGA") from February, 2012, through September, 2012. (R. 20.)

However, the ALJ found there had been continuous twelve month periods during which

Claimant did not engage in SGA. *Id.* At step two, the ALJ found Claimant had the severe

impairments of depression, asthma, degenerative arthritis, obesity, and diabetes. *Id.* At step

three, the ALJ found Claimant did not have an impairment or a combination of impairments that

met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). (R. 21.)

Before step four, the ALJ found Claimant had the residual functional capacity ("RFC") to

do light work. (R. 23.) The ALJ also limited Claimant to jobs that involved simple work related

decisions and routine workplace changes. *Id.* Relatedly, the ALJ determined that Claimant

could not do work that involved more than simple, routine, repetitive tasks with simple

instructions. *Id.* The ALJ further restricted Claimant's RFC because Claimant: could never

climb ladders, ropes, or scaffolds; could never work in close proximity to unprotected heights or

dangerous, moving machinery; and only could occasionally crouch, crawl, stoop, kneel, and

balance. *Id.* Finally, the ALJ found Claimant should avoid concentrated exposure to pulmonary

irritants, poor ventilation, and extreme cold. *Id.* Based on this RFC, the ALJ determined at step

four that Claimant could not perform any past relevant work. (R. 28.) Finally, at step five, the

ALJ found there were jobs that existed in significant numbers in the national economy that Claimant could perform. (R. 29.) Specifically, the ALJ found Claimant could work as a cashier, a cafeteria attendant, and a light packager. *Id.*

Because of this determination, the ALJ found that Claimant was not disabled under the Act. (R. 30.) On November 20, 2012, Claimant sought review of the ALJ's decision. *See* R. 1. On February 27, 2014, the Social Security Appeals Council denied the request. *Id.* That denial made the ALJ's opinion into the final decision of the Commissioner. *Id. See also Nelms*, 553 F.3d at 1097. Claimant now seeks review in this Court pursuant to 42 U.S.C. § 405(g). *See Haynes v. Baumhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II. STANDARD OF REVIEW

A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel,* 530 U.S. 103, 106-07 (2000). A claimant then may seek review of this final decision in the district court. *Id.* Judicial review is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his decision. *Nelms v. Astrue,* 553 F.3d 1093, 1097 (7th Cir. 2009). The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002). Even when there is adequate evidence in the record to support the decision, however, the district court will not uphold the ALJ's findings if the ALJ did not "build an accurate and logical bridge from

3

the evidence to the conclusion." *Berger v. Astrue,* 516 F.3d 539, 544 (7th Cir. 2008). In other words, if the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009). Though the substantial evidence standard is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue,* 534 F.3d 663, 665 (7th Cir. 2008). The court may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008).

### III. ANALYSIS

Claimant asserts that the ALJ made three errors. First, Claimant claims that the ALJ erred by not sufficiently analyzing the medical opinion of her treating physician pursuant to 20 C.F.R. § 404.1527. Second, Claimant contends that the ALJ rejected all medical opinions and filled the resulting evidentiary gap in the record with his own lay opinion. Third, Claimant argues that the RFC did not sufficiently account for all of her limitations. The Court finds the ALJ did not commit any of these errors.

**1.     The ALJ Properly Weighed The Opinion Evidence.**

Claimant asserts that the ALJ failed to properly evaluate the opinion of treating physician Dr. Cheryl E. Woodson. On March 21, 2011, Dr. Woodson completed an RFC Questionnaire. (R. 693-694.) In this questionnaire, Dr. Woodson opined that Claimant could only stand/walk for ten minutes at a time one time and that Claimant could stand/walk zero hours during an eight-hour workday ("workday"). (R. 693.) Dr. Woodson also stated that Claimant could only sit for thirty minutes at one time and sit for a total of four hours ("with frequent breaks") during a workday. *Id.* Dr. Woodson then noted a number of additional limitations related to shifting

4

positions, taking breaks, lifting/carrying, handling/fingering, and missing work. (R. 693-694.) Dr. Woodson also explained that all of Claimant's conditions, including her depression, "have a cumulative effect to decrease her function." (R. 694.) In this case the ALJ afforded little weight to Dr. Woodson's opinion because it was not supported by the record. (R. 27.)

## A. The ALJ Provided Good Reasons For Discounting Dr. Woodson's Opinion.

The ALJ offered three reasons for this weight determination. Most importantly, the ALJ explained how Claimant's own testimony contradicted Dr. Woodson's opinion. *Id.* The ALJ detailed how Claimant testified that she could stand for about sixty to eighty minutes. *Id.* The ALJ also described Claimant's testimony that, even after standing for that long, she could take a roughly fifteen minute break and then stand again. *Id.* Next, the ALJ noted that Claimant had a normal gait throughout the record. *Id.* Finally, the ALJ reported that Claimant's imaging studies showed minimal findings. *Id.* Each of these rationales is supported by the record.

With respect to standing, Claimant testified that, beginning in February, 2012, she worked three days a week at a casino, dealing Black Jack and Texas Hold'em. (R. 51-52.) She worked two days and then took three days off before working her final day for the week. (R. 61.) After that cycle, Claimant would get one off-day before starting again with the two work days. *Id.* Typically, Claimant's shifts ran from 11:00 until 7:00. (R. 51.) And during her shifts, Claimant stood "maybe for about an hour and [twenty] minutes" and then got "a break every hour and [twenty] minutes for [twenty] minutes." (R. 52.) Claimant later testified that some of her supervisors allowed her to sit while she dealt. (R. 60.) When she was working with one of these accommodating supervisors, Claimant sat "comfortably for maybe about . . . an hour and [twenty minutes]," followed by a twenty minute break. (R. 61.) It seems that most of the supervisors were accommodating because Claimant sat a majority of the time. (R. 75.) Claimant

5

did not take any additional breaks that were not offered to other dealers at the casino. (R. 61.) In September, 2012, the casino gave Claimant personal leave. (R. 60.)

The Court will not find that working three days per week at a casino equates to an ability to do full-time work. Indeed, Claimant testified that the interspersion of off-days was a factor in allowing her to work at the casino. (R. 61.) But Claimant has not asserted that the ALJ relied entirely on her work at the casino to find that she was not disabled. Indeed, that simply is not the case. Instead, the limited issue presented by Claimant's first argument is whether Claimant's testimony about this work is inconsistent with Dr. Woodson's RFC.

Claimant testified that she could both sit and stand for about eighty minutes at one time. (R. 52, 61.) This is contrary to Dr. Woodson's opinion that Claimant only could sit thirty minutes at one time and stand/walk ten minutes at one time. (R. 693). Also, Claimant testified that she worked eight-hour shifts. (R. 51.) The Court has not found evidence in the record about whether Claimant received a meal break each day. In an abundance of caution, the Court will assume that Claimant received an hour-long break in addition to the multiple twenty-minute breaks that she described. With this assumption, Claimant would spend 420 minutes at the casino, outside of the hour-long break. During the remaining time, Claimant would complete 4.2 "cycles" – where a "cycle" is working for eighty minutes and then taking a twenty minute break. That means Claimant would be sitting or standing (depending on her supervisor) for 336 minutes, or a little over five-and-a-half hours, each workday. Therefore, Claimant's testimony also directly contradicts Dr. Woodson's opinion that Claimant could sit only four hours during a workday and stand zero total hours in a workday. (R. 693.) It should be noted that Dr. Woodson said Claimant would need "frequent breaks" to be able to sit four hours during a workday. *Id.*

But Claimant testified that she only took breaks every eighty minutes and she did not take additional breaks that were not given to other employees. (R. 52, 61.)

Finally, Dr. Woodson's claim that Claimant would have to be permitted to shift positions at will is contrary to the already summarized testimony. Claimant stated that certain supervisors would not allow her to sit, meaning she would need to stand for eighty minutes at a time when the unaccommodating supervisors were on duty. (R. 60.)

Claimant has largely failed to address this basis for discounting Dr. Woodson's opinion. Claimant discusses her testimony about her ability to sit and stand at the casino on just two pages of her initial brief. On page six, Claimant notes she worked part-time as a dealer, she was allowed to sit while dealing, she suffered asthma attacks while dealing (because of the smoke), and she was on personal leave at the time of the hearing. [ECF No. 19, at 6.] All of these facts are consistent with the above discussed testimony. Claimant's second mention of her work at the casino appears on page eleven, where she asserts that the evidence showed she "had a severe arthritic condition in her feet, degenerative joint disease, and lumbar pain that prevented her from . . . standing for long periods as a card dealer." *Id.* at 11. This assertion does not change either her testimony or Dr. Woodson's opinion. Thus, it does not undercut the ALJ's rationale for discounting Dr. Woodson's opinion.

Although not mentioned by Claimant, the Court will raise one matter that is worth addressing. Dr. Woodson's opinion regarding sitting, standing/walking, and shifting positions was crafted with "a competitive work situation on an ongoing basis" in mind. (R. 693.) Of course, the casino was a competitive work situation. If the Court were to accept the reading most favorable to Claimant, "ongoing basis" could refer to full-time work. And it is indisputably true that Claimant's part-time work at the casino does not establish by itself that she could work full-

time or even that she could follow the same sitting/standing regime for a full-time job. But that does not change the fact that Claimant's testimony evidences an ability to sit and walk that is significantly different than that conveyed by Dr. Woodson's opinion. Therefore, Claimant has not shown the ALJ erred in finding Dr. Woodson's opinion inconsistent with Claimant's testimony.

The ALJ's second reason for giving little weight to Dr. Woodson's opinion is that Claimant had a normal gait throughout the record. (R. 27.) Although the ALJ did not cite the evidence of normal gait when discussing Dr. Woodson, this rationale clearly references the ALJ's earlier consideration of Claimant's normal gait. The ALJ noted that during a November 2009 consultative examination for Disability Determination Service ("DDS"), Claimant's "gait was non-antalgic without use of assistive device." (R. 24.) This accurately reflected the underlying medical record. (R. 627.) The ALJ described the same finding from a June 2011 consultative examination for DDS. (R. 25.) Again, the ALJ's characterization of the record was accurate. (R. 708.) Finally, when summarizing the evidence, the ALJ string cited the findings from both DDS examinations and an April 2011 report from Chukwuemka Ezike, one of Claimant's physicians. (R. 26.) The ALJ reported that Dr. Ezike found Claimant to have a normal gait, which Dr. Ezike did. (R. 26, 769.)

A person's gait is his or her "manner or style of walking." *Gait*, DORLAND'S MEDICAL DICTIONARY, *available at* http://www.dorlands.com (last visited Feb. 24, 2016). An antalgic gait is "a limp adopted so as to avoid pain on weight-bearing structures[.]" *Id.* That means someone with a normal, non-antalgic gait has a normal style of walking and does not limp to avoid pain. While a healthy gait does not establish on its own that someone definitely can walk more than ten minutes at a time or walk more than one total hour during a workday, it is evidence that a

8

reasonable mind may accept as indicating more ability than noted by Dr. Woodson. Indeed, it seems relatively straight-forward that someone who walks abnormally or with a limp will be more likely to have a diminished ability to walk, everything else being equal. Therefore, these examination results are a permissible basis for according less weight to Dr. Woodson's opinion.

Claimant never really addresses the ALJ's reliance on the evidence of her normal gait. The closest she comes is to note that this evidence "does not diminish the fact that her chronic condition limits her ability to perform work on a full-time basis, as indicated by her testimony and the record evidence." [ECF No. 29, at 4]; *see also id.* at 3, 6, 7 (providing similar arguments that do not undercut this rationale). But, even if true, this assertion would not mean the ALJ was wrong to discount Dr. Woodson's opinion because of Claimant's normal gait. It would just mean that other factors indicated the doctor's opinion should be given more weight. But it is the ALJ's responsibility to weigh and evaluation all that evidence, which she did here. Therefore, this point is not responsive to the ALJ's second proffered reason. (The substance of Claimant's non-responsive argument will be dealt with shortly.)

The ALJ's third and final reason for giving little weight to Dr. Woodson's opinion was that Claimant's imaging studies showed minimal findings. (R. 27.) Again, the ALJ did not cite those studies when making this observation with respect to Dr. Woodson. But this point is clearly a reference to the ALJ's earlier discussion of the imaging studies. The ALJ described three imaging tests. (R. 24, 25, 26.)[1] In August, 2010, Claimant had x-rays of her cervical spine "which showed mild reversal of cervical lordosis." (R. 24.) In February, 2011, she had x-rays of her right hip that showed "questionable lateral marginal osteophyte," but also showed no fracture or subluxation. *Id.* Finally, Claimant's feet were x-rayed in March, 2011, revealing only

---

[1] The ALJ also noted the absence of an EMG that supports Claimant's allegations of problems with her hands. (R. 21.) The absence of a test is not the same as a test with minimal findings. Thus, the Court will not consider the absence of an EMG.

degenerative arthritis. The ALJ found that all of these imaging tests revealed only minimal findings. (R. 26.)

The ALJ's characterization of the x-rays of Claimant's cervical spine is accurate. The report of the test's findings reveals that there was "no evidence of a fracture, subluxation[,] or prevertebral soft tissue swelling." (R. 672.) There was "[n]o significant osteophyte formation" and the odontoid process was "unremarkable." *Id.* Indeed, the only evidence of a problem was the "*mild* reversal of cervical lordosis" reflecting muscle spasms. *Id.* (emphasis added). The ALJ also properly described the x-rays of Claimant's right hip. The report of that test stated that there were "[n]o acute findings" and no facture or subluxation. (R. 755.) The report did mention osteophyte, which is "a bony excrescence or osseous outgrowth." *Id.*; *Osteophyte*, DORLAND'S MEDICAL DICTIONARY. But the test only uncovered "question lateral marginal osteophyte," which is far from a major finding. (R. 755.) The last two tests are the x-rays of Claimant's feet. (R. 779-780.) Both x-rays revealed early degenerative arthritis. *Id.* With the left foot, the arthritis was seen at the calcaneum, talus, and navicular bones. (R. 779.) With the right foot, the arthritis was seen at these three bones and at the cuneiform bone. (R. 780.) These findings are unremarkable. The x-rays also revealed a flattening of the plantar archers of both feet, which again is not major. *Id.* There were no other noteworthy findings.

The tests simply do not show the type of significant physical problems that might support the severe limitations contained in Dr. Woodson's opinion. Claimant once references one of these three imaging studies in her briefs. [ECF No. 19, at 10.] And that mention only amounts to a correct description of the findings of the cervical spine x-ray. Claimant simply failed to explain why these findings were not minimal and, thus, why they did not support discounting Dr. Woodson's opinion.

10

As the above discussion should make clear, none of the three reasons that the ALJ

provided establishes definitively that Dr. Woodson's opinion was wrong. But a reasonable mind

could accept each reason as a justification for giving less weight to Dr. Woodson's opinion. It is

not the role of this Court to reconsider the facts or evidence, or to resolve conflicts. *Elder,* 529

F.3d at 413. Moreover, as repeatedly emphasized above, Claimant simply has not thoroughly

addressed any of the ALJ's reasons for discounting Dr. Woodson's opinion. Instead, Claimant

has tried to identify a number of other failings in how the ALJ weighed the doctor's opinion, as

discussed below.

### B. The ALJ Did Not Neglect To Apply The Factors In 20 C.F.R. § 404.1527.

Claimant asserts that the ALJ failed to apply the factors set forth in 20 C.F.R. § 404.1527

in determining the weight to be given to medical opinions. The Social Security regulations list a

variety of factors that an ALJ should consider in weighing medical opinions, including: (1)

whether the physician has examined the claimant; (2) whether a treatment relationship exists and

the length, nature and extent of the treatment relationship; (3) whether the opinion is supported

by relevant evidence; (4) whether the opinion is consistent with the record as a whole; (5)

whether the physician is a specialist on the particular conditions alleged to be suffered by the

Claimant; and (6) any other factors that may be relevant. 20 C.F.R. § 404.1527(c); *Moss v.*

*Astrue,* 555 F.3d 556, 561 (7th Cir. 2009).

There is a fundamental problem with Claimant's argument. In the Seventh Circuit, an

ALJ need not "explicitly weigh every factor . . . ." *Henke v. Astrue*, 498 F. App'x 636, 640 n.3

(7th Cir. 2012). Instead, an ALJ need only "sufficiently account for the factors." *Schreiber v.*

*Colvin*, 519 F. App'x 951, 959 (7th Cir. 2013). In this case, the ALJ noted that Dr. Woodson

was Claimant's treating primary care physician since 2001. (R. 27.) And he discussed at length

Dr. Woodson's opinion. Crucially, he described how the opinion was inconsistent both with Claimant's testimony and the broader record. No more was required.

### C. The ALJ Did Not Improperly Consider The Medical Evidence When Weighing Dr. Woodson's Opinion.

Claimant next contends that the medical evidence actually supported, rather than contradicted, Dr. Woodson's opinion. To support this argument, Claimant relies on just two tests. Claimant first cites the finding from the x-ray of her cervical spine in August, 2010, emphasizing that it revealed reversal of cervical lordosis. (R. 672.) As discussed above, the ALJ considered this test. Moreover, Claimant leaves out a key word in her description; the test uncovered only "*mild* reversal of cervical lordosis." *Id.* (emphasis added). Claimant also points to a May 2011 x-ray which showed bilateral severe midfoot arthritis. (R. 704.) But in the very report that conveyed these findings, Dr. Rachel Erwin mentioned that Claimant "states there is little numbness in the feet but no pain." (R. 702.) Moreover, the ALJ devoted extensive attention to the wealth of other evidence related to the condition of Claimant's feet and the resulting limitations. (R. 23, 25, 26, 28.) And Claimant never links this x-ray to a work limitation or explains how this x-ray undercuts the other substantial evidence analyzed and cited by the ALJ.

### D. The ALJ Did Not Improperly Evaluate The Combined Impact Of Claimant's Impairments When Weighing Dr. Woodson's Opinion.

Claimant's main critique of the ALJ's weight determination is that the ALJ "failed to consider the combined impact of Ms. Stephens' physical and mental impairments in weighing" Dr. Woodson's opinion. [ECF No. 19, at 12.] A contention that the ALJ failed to consider the aggregate effects of a claimant's impairments may seem to be more appropriately couched as a

challenge to the RFC. But Claimant's argument can be understood as essentially contesting the ALJ's determination that Dr. Woodson's opinion was "not supported by the record." (R. 27.)

Claimant focuses on the interplay between obesity, arthritis, depression, and musculoskeletal issues. According to Claimant, her obesity worsened the severe arthritis in her feet, the degenerative joint disease, and the lumbar pain by increasing the strain on each of the relevant parts of the body. Claimant's depression caused her to turn to food for comfort, causing her to become more obese. And, finally, Claimant's musculoskeletal problems made it more difficult for her to exercise properly, further exacerbating her obesity. Claimant asserts that the relationship among these conditions supports Dr. Woodson's opinion that "[p]hysical pain and lack of stamina aggravates depression because all of [Claimant's] conditions have a cumulative effect to decrease her function." (R. 694.)

There are several reasons why this argument is of no avail. First, the ALJ did not discount Dr. Woodson's opinion based on a disagreement with Dr. Woodson's contention that the conditions had a cumulative effect. That means this argument essentially attacks a strawman. Second, and relatedly, the ALJ actually discounted Dr. Woodson's opinion because, in the ALJ's view, the record did not support specific standing, sitting, and shifting limitations in the doctor's opinion. The ALJ identified substantial evidence of Claimant's actual limitations. Even if the ALJ were wrong to conclude that the limitations resulted from the separate effects of Claimant's condition rather than their cumulative effect, that error would be harmless if the resulting limitations were correct. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (finding that indirectly factoring obesity into a decision, rather than explicitly considering it, is sufficient). And, in this case, Claimant has not explained how the ALJ's supposed failure to consider the cumulative effect of her impairments undermined the ALJ's determination of her limitations.

13

*See Hisle v. Astrue*, 258 F. App'x 33, 37 (7th Cir. 2007) (explaining that a "claimant must articulate how her obesity limits her functioning and exacerbates her impairments"). Instead, Claimant simply made general conclusions that, for example, the cumulative effect made "it difficult to perform her work." [ECF No. 19, at 10.]

This point may be made clearly with an example. Regardless of what caused Claimant's arthritis, the March 2011 and May 2011 x-rays of Claimant's feet showed the state of her arthritis at that time. In determining how Claimant's arthritis limited her ability to stand, walk, sit, and so on, her testimony and her daily activities reflected the limiting effects of her arthritic condition at the relevant time. (R. 21-22, 23.) Likewise, a DDS examination from November, 2009, contained many findings related to Claimant's ability to move, get up from a sitting position, walk, raise her leg, squat, and her range of motion. (R. 24, 624-628.) The same is true of her April 2011 DDS examination. (R. 25, 706-709.) And so on. All of this evidence reflected the extent of Claimant's arthritis at the time and the limiting effect of her arthritis at the time. The fact that the arthritis was caused by her obesity does not change the nature or extent of her limitation. *See Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006) (recognizing that it is harmless error when an ALJ fails to explicitly consider obesity but indirectly factors obesity into her decision by relying on evidence that accounts for the obesity). And the ALJ evaluated and considered Claimant's condition at relevant times.

Moreover, the ALJ explicitly addressed the interrelation of some of these conditions. For instance, the ALJ noted that, during one test, Claimant could not completely squat because of her "body habitus and knee joint pain." (R. 24.) Likewise, the ALJ recognized the finding in one examination that her back problems, knee problems, and hip problems were the result of her "body habitus, history of depression, history of asthma, and obesity." *Id.* And the ALJ

discussed an April 2011 evaluation that revealed Claimant's foot pain reduced her ability to walk which in turn distorted her blood sugar levels. (R. 25.) Put simply, the ALJ considered all of Claimant's impairments and how they limited her ability to work; it is not this Court's role to reconsider the facts or evidence. *Elder,* 529 F.3d at 413.

The ALJ not only adequately considered the limitations that resulted from Claimant's conditions, but also thoroughly addressed the conditions themselves. The Court need not repeat the ALJ's entire opinion here, but one example (her depression) may be instructive. The ALJ discussed Claimant's social functioning on page 22 of the record, where he reported her irritability and lack of interest in spending time with others. (R. 22.) He also detailed how she attended church several times a week, taught bible study class, interacted with family members (on a daily basis), and maintained multiple friendships (which involved going to movies and eating out.) *Id.* Then, the ALJ reported some of Claimant's attempts to control her depression with medication, the fluctuation of her condition, and some of its limiting effects. (R. 25-26.) The ALJ detailed the findings from two psychiatric evaluations conducted by DDS in October, 2009, and June, 2011. (R. 26.) Finally, the ALJ spent about one-third of a page discussing the opinion of a state agency psychological consultant, Ellen Rozenfeld, which the ALJ gave great weight. (R. 28.) Clearly, the ALJ did not fail to consider the extent of Claimant's depression.

Claimant's final challenges to the ALJ's analysis of Dr. Woodson's opinion involve a smattering of minor points. Claimant attacks the ALJ for relying on Claimant's ability to walk greater than fifty feet without the support of an assistive device. [ECF No. 19, at 9 (citing R. 25).] But the ALJ did not place undue weight on this piece of evidence; it was just one in a long list of findings from a June 2011 DDS examination. Claimant also contends that the ALJ did not consider the limits on her daily activities – specifically, that she worked as a dealer three days

each week and received a sitting accommodation from some supervisors. The ALJ noted both of these facts. (R. 20.) And the ALJ clearly considered Claimant's testimony about her work as a dealer when determining how to weigh Dr. Woodson's opinion. *See* R. 27.

Having dealt with Claimant's arguments, it is worth emphasizing that the ALJ's decision to reject Dr. Woodson's opinion was supported by substantial evidence. Of course, there are all of the tests and objective medical findings described above. There also are Claimant's extensive daily activities, many of which require walking and standing. In addition to those already mentioned, Claimant attended school full-time for a portion of the relevant period, coordinated expos at her church, took care of herself, cooked, cleaned, did laundry, and took public transportation.[2] There also were medical opinions in the record other than Dr. Woodson's. A 2008 Functional Capacity Evaluation Report documented a substantially greater ability to sit, stand, and walk than did Dr. Woodson. (R. 310-318.) Likewise, a state agency medical consultant opined in 2011 that Claimant could stand/walk six hours during a workday and sit for the same amount of time. (R. 736.)[3] The ALJ gave the 2008 opinion great weight and the 2011 opinion some weight. Claimant has not challenged the ALJ's weight determinations with respect to the 2008 and 2011 opinions. A reasonable mind may have found this evidence – all of which was discussed by the ALJ – adequate to conclude that Claimant's ability to stand, walk, and sit was greater than Dr. Woodson opined. Stated another way, there is substantial evidence to

---

[2] Claimant makes an undeveloped attack on the ALJ's treatment of her daily activities. [ECF No. 29, at 8.] She notes that daily activities are not the same as working full-time. This contention simply sets up a strawman that the ALJ did not breath life into. Claimant also asserts in one sentence that the ALJ should have found out "how she performed such activities." *Id.* She has not explained why the ALJ was required to do so. Moreover, she has not explained why that would have mattered. This is a particularly misguided argument in this case because Claimant testified at length about her daily activities and completed detailed reports about her daily activities that the ALJ discussed.
[3] That opinion was affirmed by another state agency medical consultant. (R. 742-745.)

support the ALJ's assertion that the record did not support Dr. Woodson's opinion. And that in turn means the ALJ did not err in discounting the doctor's opinion for this reason.

## 2. The ALJ Did Not Reject All Medical Opinions And Fill A Resulting Evidentiary Gap With Lay Opinions.

Claimant asserts that the ALJ erred by rejecting all medical opinions and filling the evidentiary gap in the record with his own lay opinions.

Claimant's first argument is that the ALJ erred by finding her capable of light work because no medical opinion found that she could perform that level of work. But Dr. Vidya Madala, the state agency physician, found Claimant could perform medium work. (R. 735-742.) The ALJ gave this opinion some weight, and Claimant has not argued that this weight determination was improper. (R. 27.) Under the Social Security Regulations, "If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567. That means the state agency physician's opinion effectively was an opinion that Claimant could do not only medium work but also light and sedentary work. Further, the 2008 Functional Capacity Evaluation completed at the Accelerated Rehabilitation Centers ("ARC FCE") found that Claimant could perform light work as defined by the Department of Labor. (R. 310.) Light work is defined differently in the DICTIONARY OF OCCUPATIONAL TITLES and the Social Security Regulations. DICTIONARY OF OCCUPATIONAL TITLES, app. C, at (iv)(c), *available at*, 1991 WL 688702. But they have significant similarities that make an opinion about one at least relevant to the other. The ALJ gave the ARC FCE great weight, and Claimant has not contested this weight determination. (R. 27.) Therefore, Claimant's characterization of the record simply is not accurate.

It is true Dr. Woodson opined Claimant could not do light work. "Weighing conflicting evidence from medical experts, however, is exactly what the ALJ is required to do." *Young v.*

17

*Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). This Court "may not re-weigh the evidence." *Id.*
Further, in assessing a claimant's RFC, an ALJ must consider both medical and nonmedical
evidence. *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). And all of the previously
discussed non-opinion evidence is highly relevant to whether Claimant can perform light work.
Therefore, the ALJ did err by considering this evidence when determining Claimant's RFC.

Claimant also contends that the ALJ cherry-picked from the medical opinions. Claimant
argues that the ALJ should not have found she could stoop occasionally because the ARC FCE
reported that Claimant had a 50% reduction in lumbar flexion and only a 30-degree flexion in the
lumbar region. However, the ARC FCE explicitly stated that Claimant had only "mild difficult
with stooping . . . ." (R. 314.) Even more on point, the ARC FCE stated that Claimant could
stoop "occasional[ly]" and that, while she avoids stooping, there was "no objective difficulty
noted" when she stooped. (R. 315.) Therefore, there was no conflict between the ARC FCE and
the RFC regarding Claimant's stooping ability.

Claimant similarly asserts that the ALJ impermissibly credited the ARC FCE's finding
about how much Claimant could lift while simultaneously failing to credit its opinion about how
much Claimant could stand. The ARC FCE stated that Claimant could frequently lift twenty
pounds from floor to waist and floor to overhead. (R. 312.) This lifting level would satisfy the
definition of light work in the Social Security Regulations. 20 C.F.R. § 404.1567(b). Dr.
Woodson also opined that Claimant could lift enough to perform light work, stating that she
could frequently lift weights under ten pounds and occasionally lift weights between ten and
twenty pounds. (R. 694.) Dr. Madala stated that Claimant could lift even more. (R. 736.) Thus,
every medical opinion in the record supports the ALJ's lifting limitation.

Claimant contends, though, that because the ALJ agreed with the ARC FCE's lifting limitation, the ALJ should have accepted its standing limitation. It is not clear whether the ARC FCE's assessment meant Claimant could "only stand for 59% of the time," as Claimant characterizes it. [ECF No. 29, at 7.] The ARC FCE actually stated that Claimant "displayed dynamic standing tolerances for 13 minutes to 1 hour 30 minutes x 4 intervals. Total standing throughout the FCE was 2 hours 32 minutes, which equates to 59% [of FCE]. She exhibited moderate difficulty with standing." (R. 313.) In light of these findings, Claimant was, according to the report, capable of standing occasionally. (R. 315.) It is not clear from the report what "59% [of FCE]" means. Basically, it is not clear what the units of the percentage are and how those units correspond to an ability to stand. And Claimant has not explained how she determined what it meant. With no way to figure out what "scoring system" the 59% refers to, it is impossible to know if that number actually is inconsistent with light work.

Crucially, though, an ALJ is not required to credit every part of a medical opinion just because he credits one part. Here, the ALJ had good reason to agree with the ARC's lifting limitation; ever other doctor agreed that Claimant's lifting limitation was not significantly more restrictive. But with respect to standing, there was a contrary medical opinion in the record which was substantially more recent. There also was other substantial evidence (medical and non-medical) in the record, much of which post-dated the ARC FCE. Faced with this record, it was the ALJ's job to weigh all of this evidence and decide which physician to believe. *Young*, 362 F.3d at 1001. *See also Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002). This Court cannot throw out the ALJ's determination just because the Claimant wishes that the ALJ weighed the evidence differently.

**3.      The ALJ Properly Accounted for Claimant's Leg Problems.**

As the ALJ noted, Claimant testified she suffered from pain and swelling in her feet. (R. 23.) The ALJ also described Claimant's claim that she elevated and soaked her feet to help cope with the pain and swelling. *Id.* Claimant contends the ALJ should have accommodated the need for elevation by restricting her to jobs were she could elevate her feet. But there is scant evidence that this limitation is merited. Claimant has not identified any medical opinion in the record stating she needs to elevate her feet. In fact, Claimant has not even identified any objective medical evidence showing she needs to elevate her feet. Instead, Claimant relies solely on her own testimony that her pain and swelling required her to elevate her feet. That testimony, however, is far from convincing on the matter. Here is the only question-and-answer series that even mentioned elevation.

Question: "Does anything make it better or make it worse for your feet?" (R. 68.)

Answer: "Well, for my feet, I just, I elevate them, I soap them in Epson salt, you know --[.]" *Id.*

There are a couple things to note about this back-and-forth. Claimant said elevating her feet makes them feel better. She did not say, though, that she could not work unless she elevated her feet. She did not say how often she needed to elevate her feet. She did not say how long she needed to elevate her feet. She said there was at least one alternative method of coping that did not require elevation. Whether that method was just as good or only worked when done in concert with elevation is not clear. Because of these issues, the Court is only left to speculate whether, even if the ALJ accepted Claimant's testimony, a limitation would need to be added to Claimant's RFC. In other words, even if her testimony evidenced pain and swelling, it is not evidence of a need for an elevation-related work limitation. Linking her testimony to such a

limitation would require speculation. Claimant has therefore failed to meet her burden of proof. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

This is not the only problem with Claimant's argument. There is, of course, all of the substantial evidence discussed above showing that Claimant's feet would not prevent her from working. Until one month before the hearing, Claimant worked at a casino, and there is no evidence that she was allowed to elevate her feet while on-the-job. Moreover, there is all the objective medical evidence and opinion evidence in the record, none of which reveals a condition that requires foot elevation. Finally, in April, 2011, after a lap-band surgery, Claimant told one of her doctors that the swelling and pain levels had decreased. (R. 25, 773.) In May, Claimant stated that she was wearing inserts and gym shoes, completely eliminating the pain. (R. 26, 766.) Thus, the ALJ's decision not to include a foot-elevation limitation is supported by substantial evidence.

## IV. CONCLUSION

For the reasons stated above, Claimant's motion for summary judgment [ECF No. 19] is denied, and the Commissioner's motion for summary judgment is granted [ECF No. 23]. The decision of the Commissioner is affirmed. This is a final judgment.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated: March 29, 2016